**In the Matter of Albert A. KLIX and Sandra Klix, Debtors.**

**FORD MOTOR CREDIT COMPANY, a Delaware corporation, Plaintiff,**

v.

**Albert A. KLIX and Sandra Klix, jointly and severally, Defendants.**

Bankruptcy No. 81–06312–W.
Adv. No. 82–0035–W.

United States Bankruptcy Court,
E. D. Michigan, S. D.

Sept. 21, 1982.

**188**

Kevin F. Carr, Southfield, Mich., for Klix.

Charles L. McKelvie, Grosse Pointe, Mich., for Ford Motor Credit Co.

## MEMORANDUM OPINION AND ORDER

GEORGE E. WOODS, Bankruptcy Judge.

This matter comes before the Court on the complaint of Ford Motor Credit Company (Ford Credit) for a determination that its claim against the debtors is non-dischargeable under § 523(a)(6).

In 1964, the debtors became the owners of a Ford dealership in Algonac, Michigan— Al Klix Ford, which dealership had a floor plan financing arrangement with Ford Credit. Under the terms of the agreement, the dealership was to remit to Ford Credit the principal amount borrowed to finance the purchase of a vehicle upon sale of the vehicle. The obligations of the dealership under the floor plan arrangement were personally guaranteed by the debtors.

On August 19, 1974, Ford Credit discovered, by way of an inventory audit, that the dealership had sold six vehicles "out of trust", *i.e.,* title had been conveyed but Ford had not been paid. In October of 1974, Al Klix Ford filed for bankruptcy.

Ford Credit subsequently initiated suit in St. Clair County Circuit Court against the debtors as guarantors, seeking judgment for breach of contract and common law fraud. The Court dismissed the fraud count but granted judgment on the breach of contract claim for $24,576.87 plus interest.

On November 4, 1981, Albert and Sandra Klix filed for relief under Chapter 7. On January 11, 1982, Ford Credit filed an adversary complaint, seeking to except from discharge the $24,576.86 plus interest owed to it.

At the trial on the matter, Mr. Klix testified that in August of 1974 the financial position of the dealership was "weak". Ford Credit placed the dealership on a "finance hold" position, refusing to finance future vehicle purchases.

On August 14, 1974, Mr. Klix filed applications for certification of title, RD 108 forms, for Richard Donner on three vehicles. Mr. Donner was and had been a business associate of Mr. Klix who often "birddogged" potential customers for him. In the normal course of business, Mr. Klix would require payment before filing an RD 108. In exceptional circumstances, Mr. Klix might forward an application for title before receiving full payment, but he would nonetheless remit compensation to Ford Credit from his own funds before filing the RD 108. On August 14, 1974, however, Mr. Klix filed RD 108 forms for Mr. Donner without receiving payment and without forwarding the amount borrowed to Ford Credit. He also signed the forms, misrepresenting that he had received full payment.

Mr. Donner and two of the vehicles subsequently disappeared. Mrs. Klix drove the third vehicle, a Maverick, until a title dispute arose. At that time, Mr. Klix testified that he parked the Maverick in Detroit and turned the keys over to his attorney— whereupon the Maverick also disappeared.

Mr. Klix further stated that he never sued Mr. Donner, nor did he list Mr. Donner as a debtor on his bankruptcy schedules. Mr. Klix also indicated that he may have owed Mr. Donner up to $8,000.00 for vehicles sold on consignment.

The question before the Court is whether the debtor "willfully and maliciously" converted the property of the plaintiff, thereby rendering the debt non-dischargeable under 11 U.S.C. § 523(a)(6).

Section 523(a)(6) provides in pertinent part:

> A discharge under section 727, 1141 or 1328(b) of this title does not discharge an individual debtor from any debt...
>
> > For malicious and willful injury by the debtor to another entity or to the property of another entity.

In *Tinker v. Colwell,* 193 U.S. 473, 487, 24 S.Ct. 505, 48 L.Ed. 754 (1902), the Supreme Court, interpreting the parallel provision to § 523(a)(6)–§ 17(a)(2) of the Act, determined that "a specific intention to hurt a particular person" was not an essential element of the term "malicious". The Court reasoned:

[W]e think a willful disregard of what one knows to be his duty, an act which is against good morals, and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously, so as to come within the exception.

193 U.S. at 487, 24 S.Ct. at 509.

The language used by Congress in § 523(a)(6) is almost identical to that before the Court in *Tinker v. Colwell, supra.* Nevertheless, the Committee Reports of the United States House of Representatives and Senate provide:

Paragraph (6) excepts debts for willful and malicious injury by the debtor to another person or to the property of another person. Under this paragraph, "willful" means deliberate or intentional. To the extent that *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1902), held that a looser standard is intended, and to the extent that other cases have relied on *Tinker* to apply a "reckless disregard" standard, they are overruled.

Senate Rep. No. 95–989, 95th Cong., 2d Sess. (1978), 77–70, U.S. Code Cong. and Admin. News 1978, 5787, 5865; *see also* House Rep. No. 95–595, 95th Cong., 1st Sess. (1977), 363, U.S. Code Cong. and Admin. News 1978, 5787.

█ It is clear from the legislative history of § 523(a)(6) that "willfulness" requires intentional and deliberate action. *In Re Langer,* 12 B.R. 957 (D.D.C.N.D.1981). The looser standard of "reckless disregard" applied under § 17(a)(2) is inappropriate. *In Re DeRosa,* 20 B.R. 307 (Bkrtcy.S.D.N.Y. 1982). A question remains, however, with regard to whether the term "malicious" in § 523(a)(6) retains the same meaning as was ascribed to it under § 17(a)(2). *DeRosa,* 20 B.R. at 313.

The definition of malice utilized under the prior act may be summarized as follows:

[T]he conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, is a willful and malicious injury within the meaning of the exception. On the other hand; a technical conversion may very well lack any element of willfulness or maliciousness necessary to except the liability from discharge.

3 *Collier on Bankruptcy* ¶ 523.116(3) (15th ed. 1979) (footnotes omitted), *quoted in, In Re McGiboney,* 8 B.R. 987, 989 (Bkrtcy.N.D. Ala.1981).

The definition of the term under the Code has been inconsistent. One line of cases requires an actual, conscious intent to harm the creditor. *See e.g., In Re Finnie,* 10 B.R. 262 (Bkrtcy.D.Mass.1981); *In Re Hinkle,* 9 B.R. 283 (Bkrtcy.D.Md.1981); *In Re Graham,* 7 B.R. 5 (Bkrtcy.D.Nev.1980); *In Re Hawkins,* 6 B.R. 97 (Bkrtcy.W.D.Ky. 1980); *In Re Hodges,* 4 B.R. 513 (Bkrtcy.W. D.Va.1980). The disadvantage of this definition of malice has been noted by several courts:

The *Hodges* case places an almost insurmountable burden on creditors when their secured property is sold, and a burden this Court is not entirely comfortable with.

When the injury is directly to a person or to the property of another, a standard of intentional harm is understandable.... But when the injury is conversion of secured property such a standard virtually renders the remedy meaningless. Under what circumstances, for instance, would a debtor ever sell secured property out of malice?

*In Re Ries,* 22 B.R. 343 (Bkrtcy.W.D.Wisc. 1982), *quoting In Re Nelson,* 10 B.R. 691, 4 C.B.C.2d 548, 549 (Bkrtcy.M.D.Ill.1981).

A second line of cases has adopted the looser *Tinker* common law definition of implied or constructive malice. *See e.g., In Re Ries, supra; DeRosa, supra; In Re McGiboney, supra; In Re Scotella,* 18 B.R. 975

(Bkrtcy.N.D.Ill.1982); *In Re Fussell,* 15 B.R. 1016 (D.C.W.D.Va.1982); *In Re Simmons,* 9 B.R. 62 (Bkrtcy.S.D.Fla.1981); *In Re McCloud,* 7 B.R. 819 (Bkrtcy.M.D.Tenn. 1980). These cases require that the debtor know that his act will harm another and proceed in the face of that knowledge. *Ries, supra.* "If an act of conversion is done deliberately and intentionally in knowing disregard of the rights of another, it falls within the statutory exclusion even though there may be an absence of special malice." *McCloud,* 7 B.R. at 825–26.

The latter definition was applied by Judge Nims in *In Re Auvenshine,* 9 B.R. 772 (Bkrtcy.W.D.Mich.1982). In *Auvenshine,* the secured creditor filed a complaint for a determination that his claim against the debtors was non-dischargeable under § 523(a)(6). The debtors, relying on the legislative history to § 523(a)(6), argued that the standard for "willful and malicious" had been made more rigid under the Code, than it was under the prior act. The Court disagreed, holding that the sale of property subject to a security interest, without payment of the debt secured, was a willful and malicious conversion. It reasoned:

> Legislative history is a helpful tool in determining the intent of the legislature where that intent is not clear. But, I fail to see how a statement in a report prepared for the assistance of Congress, usually by unidentified persons, can overrule decisions of the United States Supreme Court where almost the identical language was involved. In my opinion, *Tinker v. Colwell, supra,* is still operative and controlling.
>
> The Court is aware of the decision in *In re Hodges,* 6 B.C.D. 53, 4 B.R. 513 (Bkrtcy.W.D.Va., 1980), in which the court found that a debt due to conversion was dischargeable as it was not a "willful and malicious injury." For the reasons set forth above, I must respectfully differ with my learned colleague. In a later case, the sale of cattle subject to a security interest was held to be a willful and malicious injury to a property interest and, thus, not dischargeable. *In re*

*McCloud,* 7 B.R. 819 (Bkrtcy.M.D.Tenn., 1980).

9 B.R. at 775. *See also, In Re Penning,* 22 B.R. 616 (Bkrtcy.E.D.Mich.1982) (Holding that a debtor, by disposing of property of the creditor without accounting for the proceeds of the sale in express violation of the applicable security agreement, was guilty of willful and malicious conversion of the creditor's property).

 This Court is similarly convinced that the *Tinker* definition of malice controls. Applying the *Tinker* definition, the Court concludes that Mr. Klix willfully and maliciously converted the three vehicles floor-planned by Ford Credit.

The debtor's knowledge that his act will harm his creditor can be inferred from his experience in business, his concealment of the sale, or his admission that he read the security agreement which forbid the sale. *Ries, supra.* Mr. Klix was a businessman experienced in the selling of automobiles. He admits he released RD 108 forms, thereby transferring title, to the three vehicles at issue without remitting the principal amount borrowed to Ford Credit as required by the floor planning agreement. He further concedes that he signed the RD 108 forms indicating that total payment in cash had been received for the vehicles when in fact no cash had been received.

Mr. Klix does not argue that he lacked knowledge of his obligation under the floor planning agreement. Nor does he contend that he had an honest belief that his powers under the agreement had been enlarged. Rather, he asserts that he was gambling on his confidence in a friend and that his actions are merely evidence of bad business judgment.

It would be difficult to find that Mr. Klix possessed a purposeful intent to harm Ford Credit. However, he knew that his act of conversion was in contravention of the rights of Ford Credit, and he proceeded deliberately and intentionally in the face of that knowledge. Such an act, done intentionally and without justification or excuse, is a willful and malicious injury within the

meaning of the exception provided by § 523(a)(6). Therefore, the debt is non-dischargeable.

So ordered.