**UNITED BANK OF SOUTHGATE,**
**Plaintiff,**

v.

**Harold E. NELSON and Linda K.**
**Nelson, Defendants.**

No. 82 C 20079.

United States District Court,
N.D. Illinois, W.D.

Sept. 25, 1983.

Theodore Liebovich, Rockford, Ill., for plaintiff.

Angelo Gaziano, Rockford, Ill., for defendants.

ROSZKOWSKI, District Judge.

## ORDER

This matter comes before the court on appeal from a decision of the Bankruptcy Court, 35 B.R. 763 that a debt owed the plaintiff, United Bank of Southgate, by the debtors, Harold and Linda Nelson, was dischargeable under the Bankruptcy Code, Section 523(a)(6). The issue is whether, in the context of a debtor who disposes of encumbered property prior to bankruptcy, the Bankruptcy Court erred in using an actual conscious "intent to do harm" standard in determining that the debtor's conduct did not constitute willful and malicious conversion for the purposes of non-dischargeability under § 523(a)(6) of The Bankruptcy Code. The court holds that the Bankruptcy Judge erred in applying this standard and remands for further proceedings not inconsistent with this opinion.

Jurisdiction of the court is properly invoked pursuant to 28 U.S.C. § 1334.

## FACTS

The undisputed facts are as follows. On September 14, 1976, debtors Harold and Linda Nelson entered into a Retail Installment Contract with Kamping Land Trailer Sales for the purchase of a mobile home. The total deferred payment price of the mobile home was $21,255.57 to be paid in 83 equal installments commencing October 25, 1976. The installment contract provided that:

1) the seller retained a purchase money security in the vehicle;

2) the buyer was to maintain a policy of insurance for fire, theft and collision, showing the holder as payee;

3) the buyer was to assign all insurance proceeds to the holder.

The contract provided for acceleration upon occurrence of several events of default, among them, substantial damage to or destruction of the vehicle.

On September 17, 1976, the seller assigned all rights, title and interest it had on the vehicle to United Bank of Southgate (United Bank). The seller's right to assign was provided for in the installment contract which was signed by the debtors.

On December 10, 1978, the vehicle was involved in an accident. Without advising United Bank of the accident, the debtor filed a claim with Country Companies Mutual Insurance for an adjustment of the claim. The claim was adjusted as a total loss. On or about January 31, 1979, the insurance company issued a check payable to Harold Nelson, the debtor, and his daughter in the amount of $10,665.20. The debtor did not, as required by the Installment Contract, inform United Bank of receipt of the insurance proceeds.

Debtor's account with United Bank was current through the August 1980 installment payment. Subsequently, United Bank received only one payment in November of 1980 for $50.00.

The debtors filed their petition for bankruptcy in February of 1981. United Bank thereafter filed a complaint to determine dischargeability alleging that the debtor's receipt and retention of the insurance proceeds constituted willful and malicious conversion, an exception to discharge under 11 U.S.C. § 523(a)(6).

At trial, Robert Jakeway, Assistant Vice President of United Bank of Southgate, testified that: the bank had no knowledge prior to November 1980 that the mobile home had been destroyed. He testified that the Bank received no proceeds from the insurance adjustment and that the Bank did

not know until January 1981 that Harold and Linda Nelson received insurance proceeds for the loss.

The debtor, Linda Nelson, testified that she did not remember signing or reading the Installment Contract, but admitted that she had read similar agreements in the past. Linda Nelson's signature appears on the Installment Contract.

The debtor, Harold Nelson, testified that he had operated a tavern for 5 years, a real estate business (primarily farm real estate), and was self-employed in the business of auctioning autos. He had personally executed 200–300 Retail Installment Contracts, generally for farm machinery, but approximately 50 for vehicles, 4 or 5 of which were the same type as the mobile home. He admitted that he had read numerous installment contracts in the past, but claimed an unfamiliarity with the contract he had signed on the mobile home. He knew Southgate held the contract for the purchase of the mobile home, but claimed he did not realize Southgate had a security interest in the vehicle. Nelson explained that he was under the impression that the contract did not involve a security interest, but instead was a personal loan. He was unable to say who had suggested this to him.

Despite his testimony on January 20, 1982, that he had executed mobile home installment contracts, Mr. Nelson testified at the second hearing on March 10, 1982, that he had never executed any previous installment contracts for a mobile home.

The Bankruptcy Court held that because the Nelsons had no specific intent to harm the creditor, the debt was dischargeable and it did not fall within the "willful and malicious injury exception." The court made no findings as to whether the facts were sufficient to establish non-dischargeability if a lesser standard than the intent to do harm standard were applied.[1]

## OPINION

A debt will be deemed non-dischargeable under § 523(a)(6) if it meets *two* requirements: (1) the relevant act was *willful;* and (2) the act was *malicious.* Section 523(a)(6) excepts from discharge any debt:

(6) for willful and malicious injury by the debtor to another entity or the property of another entity.

This section is intended to encompass willful and malicious conversion of encumbered property. Congressional Record, Oct. 6, 1978, Section 17416.

Under § 523(a)(6), the Bankruptcy Courts have consistently defined "willful" as intentional or deliberate; "malicious", however, has not been consistently defined. One line of cases defines "malice" as requiring an actual conscious intent to cause harm to the creditor or the creditor's property; the other, requires only a finding of implied or constructive malicious intent.

In the present case, the Bankruptcy Court held that "malicious" required an "intent to do harm to the creditor", and thereupon found that the debtor's actions were not "malicious" conversion under Section 523(a)(6). United Bank, on appeal, contends that "malicious" requires only that the debtor realize his act would harm the creditor's interest and that the debtor proceeds in the face of that knowledge. The issue presented requires this court to ascertain the appropriate standard to be applied to the term "malicious".

## HISTORY OF THE "WILLFUL AND MALICIOUS INJURY" EXCEPTION

Examination of the history and legislative intent of the "willful and malicious injury" exception indicates that a finding of "malicious" should be premised upon an implied or constructive malicious intent and that an "intent to do harm" is not required.

Section 523(a)(6) is closely related in purpose and intent to § 17 of the Old Bankruptcy Code. Under the Act, § 17(2) ex-

---

1. The Bankruptcy Court expressly stated "[t]he Court does not reach the question whether the conduct of the debtors here constitutes a wilful and malicious conversion under a standard less than 'intent to harm'." (35 B.R. at p. 764).

cepted from discharge liabilities "for willful and malicious injuries to persons or property of another." It was amended to provide in § 17(a)(2) "for willful and malicious conversion of the property of another." This language was applied to debtors who disposed of encumbered property prior to bankruptcy. *Bennett v. W.T. Grant,* 481 F.2d 664 (4th Cir.1973). Section 523(a)(6) of the present Code is the parallel of § 17(a)(2) under the old Act. *In re DeRosa,* 20 B.R. 307 (Bkrtcy.S.D.N.Y.1982); *In re Klix,* 23 B.R. 187, 7 CBC 2d 276 (Bkrtcy.E. D.Mich.1982); *In re Scotella,* 18 B.R. 975 (Bkrtcy.N.D.Ill.1982).

In delineating the standards applicable to the "willful and malicious injury" exception (§ 17(a)(2) of the Old Act), the leading case was *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904). In *Tinker,* the Supreme Court wrote:

> ... we think a wilful disregard of what one knows to be his duty, an act which is against good morals, and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously, so as to come within the exception.

*Id.* 24 S.Ct. at 509.

The Supreme Court's language in *Tinker* has been interpreted by subsequent courts to stand for two holdings. One holding concerns willfullness; the other concerns malice.

First, *Tinker* has been read to hold that the term wilful can include reckless disregard of a duty. The Supreme Court's language, "wilful disregard of what one knows to be his duty, an act which is against good morals, and wrongful in and of itself, and which necessarily causes injury," provided the justification for reading the term wilful so broadly. Consequently, some cases involving personal injury liabilities arising out of automobile accidents were excepted from discharge even though those debts were based on reckless or even negligent conduct. In *Harrison v. Donnelly,* 153 F.2d 588, 591 (8th Cir.1946), for example, a finding of willfulness was predicated on the following standard:

an act or omission, though properly characterized as negligent, may manifest such reckless indifference to the rights of others that the law will imply that the injury resulting from it was intentionally inflicted.

Similarly, in *Den Haerynck v. Thompson,* 228 F.2d 72, 75 (10th Cir.1955), the court held excepted from discharge a debt for injury to the person arising out of the reckless operation of an automobile.

In this court's opinion, it would have been more proper to interpret the *Tinker* language is correctly interpreted to define willfull as deliberate or voluntary and the definition should not have included recklessness. Nevertheless, historically speaking, *Tinker* was read to embrace the "reckless disregard" standard.

Second, *Tinker* was read to also hold that constructive or implied malice was sufficient to establish malice under the exception, and that a showing of special malice was not required. The court believes that this was an accurate reading of *Tinker.*

In *Tinker v. Colwell,* the debtor sought to discharge a damage judgment for criminal conversion Even though the defendant had no personal malevolence toward the husband, the Supreme Court found the liability was based on a willful and malicious injury and therefore nondischargeable.

In defining the applicable standards, *willful* was defined as intentional and voluntary. In defining *malicious,* constructive or implied malice was allowed and a standard of special intent was repeatedly denied.

> There may be cases where the act has been performed without any particular malice towards the husband, but we are of the opinion that, within the meaning of the exception, *it is not necessary that there should be this particular, and, so to speak, personal malevolence toward the husband, but that the act itself necessarily implies that degree of malice which is sufficient* to bring the case within the exception stated in the statute. The act is willful, of course, in the sense that it is intentional and voluntary, and we think it

is also malicious within the meaning of the statute. *Id.* 24 S.Ct. at 508. (Emphasis added).

The Supreme Court further indicates that a "malignant spirit or a specific intention to hurt a particular person is not an essential element." (*Id.* 24 S.Ct. at 509). Rather, a standard of implied malice is adopted and endorsed.

> The law will, as we think, *imply that degree of malice in an act* of the nature under consideration, which is sufficient to bring it within the exception mentioned. *Id.* 24 S.Ct. at 508 (Emphasis added).

It is significant that the language analyzed in *Tinker* is almost identical to that in the new Code, both are exceptions for "willful and malicious injury." The language of § 17(a)(2) was amended in the Old Act and differs from *Tinker* only in that it expressly provides an exception for "willful and malicious conversion." Yet, the standard of implied or constructive malice formulated in *Tinker* was the accepted standard under § 17(a)(2), and was applied to debtors who disposed of encumbered property prior to bankruptcy.

## LEGISLATIVE HISTORY OF § 523(a)(6)

## OF THE 1978 BANKRUPTCY CODE

Based on the history of this exception and the relatedness of these sections, it would be logical to assume that the standard applicable to § 17(a)(2) of the Old Act would be equally applicable to its parallel section 523(a)(6) of the Code. However, official Congressional comments accompanying § 523(a)(6) indicate that *Tinker* was to some extent being overruled.

> Paragraph (6) excepts debts for willful and malicious injury by the debtor to another person or to the property of another person. Under this paragraph, willful means deliberate or intentional. To the extent that *Tinker v. Colwell* (citation omitted) held that a looser standard is intended, and to the extent that other cases have relied on Tinker to apply a reckless disregard standard, they are overruled. Sen.Rept. No. 95–989, 95th Cong., 2d Sess. (1978); 77–79 U.S.Code

Cong. & Admin.News 1978, 5787, 5865; *also* House Report No. 95–595, 85th Cong., 1st Sess. (1977), 363 U.S.Code Cong. & Admin.News 1978, 5787.

This passage from the Senate and House Committee Reports seems to be the source of the split in Bankruptcy opinions construing the term "malicious" under § 523(a)(6).

One line of cases, primarily early interpretations of § 523(a)(6), read the legislative record to entirely obviate *Tinker.* Consequently, these courts interpret the requirements of § 523(a)(6) to be: (1) *willful,* meaning intentional or deliberate (i.e. not reckless); and (2) *malicious,* to require an "intent to do harm," (i.e. something more than implied malice). *In re Hodges,* 4 B.R. 513 (Bkrtcy.W.D.Va.1980); *In re McLaughlin,* 14 B.R. 773 (Bkrtcy.N.D.Ga.1981); *In re Matter of Ricketts,* 16 B.R. 833 (Bkrtcy.N. D.Ga.1982); *In re Aldrich,* 16 B.R. 825 (Bkrtcy.W.D.Ky.1982); *In the Matter of Gentis,* 10 B.R. 209 (Bkrtcy.S.D.Ohio 1981); *In re Graham,* 7 B.R. 5 (Bkrtcy.D.Nev.1980); *In re Hawkins,* 6 B.R. 97 (Bkrtcy.W.D.Ky. 1980); *In re Finnie,* 10 B.R. 262 (Bkrtcy.D. Mass.1981); *In re Nelson,* 10 B.R. 691, 4 CBC 2d 548 (Bkrtcy.N.D.Ill:1981).

A second, more recent line of cases, places much less emphasis on the legislative record in interpreting § 523(a)(6) and continues to allow malice to be established through implied or constructive malice. These Courts interpret the exception to require: (1) *willful* to mean deliberate or intentional; and (2) *malicious* to be implied or constructive malice similar to the holding in *Tinker.* *In re Scotella,* 18 B.R. 975 (Bkrtcy.N.D.Ill. 1982); *In re DeRosa,* 20 B.R. 307 (Bkrtcy.S. D.N.Y.1982); *In re McCloud,* 7 B.R. 819 (Bkrtcy.M.D.Tenn.1980); *In the Matter of Klix,* 23 B.R. 187, 7 CBC 2d 276 (Bkrtcy.E. D.Mich.1982); *In the Matter of Chambers,* 23 B.R. 206 (Bkrtcy.W.D.Wis.1982); *In re Fussell,* 15 B.R. 1016 (D.C.W.D.Ba.1981); *In re Ries,* 22 B.R. 343 (Bkrtcy.W.D.Wis.1982); *In re Auvenshine,* 9 B.R. 772 (Bkrtcy.W.D. Mich.1981).

The above cited Congressional comments are, in fact, the source of the split in Bankruptcy opinions construing § 523(a)(6). As

explained earlier, *Tinker* stood for two separate and distinct propositions of law; one, permitting a loose standard of "reckless disregard" to constitute willful, and another, as which permitted implied malice to satisfy the malicious requirement. The court believes that the Congressional comments are addressed only to the first holding,—"to the extent that other cases have relied on *Tinker* to apply a reckless disregard standard, they are overruled." Congress provided a specific definition for the willful requirement, "willful means deliberate or intentional." There is nothing in the legislative record, however, to indicate that *Tinker's* malice holding has been overruled or in any way obviated. Unfortunately, a number of courts have read the legislative history as overruling *Tinker* in its entirety. It is this notion that both holdings of *Tinker* were overruled which is responsible for the split in defining malice under § 523(a)(6). A review of the two lines of cases interpreting § 523(a)(6) demonstrates this confusion and accounts for the two different standards formulated for the *malicious* requirement.

Careful review of the cases holding *malice* under § 523(a)(6) to require an "intent to do harm", reveals that *In re Hodges,* 4 B.R. 513 (Bkrtcy.W.D.Va.1980) is key in formulation and propagation of that standard. In *Hodges,* the debtor had purchased a stereo and executed a security agreement thereon. The security agreement provided that Hodges not sell, pledge, pawn or remove the goods from the address shown without the consent of the plaintiff. Shortly thereafter, Hodges became financially stressed due to illness and was unable to make regular payments on his residence or to support his family. The stereo was sold and the proceeds were used to make house payments and purchase food for the family. The Court found that Hodges did not realize that the plaintiff held a security interest in the stereo, but did understand that the plaintiff had some right pertaining to the stereo. The Court also noted that Hodges had not read the security agreement. The Court held that while the act of selling the stereo was intentional, thereby meeting the willful requirement of § 523(a)(6), it was

not done maliciously. Hodges did not know the stereo was security and motivationally the stereo had been sold so that Hodges could feed his family. It was not sold with a conscious intent to harm the creditor or his property. The debt was held dischargeable in bankruptcy.

The *Hodges* decision is premised upon the view that "with the change in bankruptcy law in 1978 came a change in the standards applicable in construing § 523(a)(6)." *Id.* at 515. According to *Hodges,* the Supreme Court defined the standard for "willful and malicious injury" in *Tinker.* The *Hodges* Court interpreted that standard to be, in general, one of "reckless disregard." (*Id.* at 515). The court read of the above cited legislative record to mean that the *Tinker* standard was abolished under the Code.

Additionally, the *Hodges* Court held that inasmuch as the Fourth Circuit in *Bennett v. W.T. Grant Co.,* 481 F.2d 664 (4th Cir. 1973) upheld the *Tinker* standard, it was also overruled. *Bennett* held that "if the act of conversion is done deliberately and intentionally in *knowing disregard* of the rights of another, it falls within the statutory exclusion even though there may be an absence of special malice." *Id.* at 665. The *Hodges* Court apparently equated "reckless disregard" with "knowing disregard". Since the Congressional commentary expressly stated that "to the extent other cases have relied on *Tinker* to apply a *reckless disregard* standard, they are overruled." (emphasis supplied), the *Hodges* court reasoned that "the 'knowing disregard' standard was expressly overruled." *Hodges* at 515.

In light of what it viewed as the obviation of the *Tinker* standard of implied or constructive malice, and "its Fourth Circuit companion" of knowing disregard, the *Hodges* Court looked to what it deemed "non-*Tinker* law" for an alternative standard for malice. While the willful requirement was defined to mean intentional or deliberate, *Hodges* substantially relied on *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934) to

establish the "intent to do harm" standard for malicious.

In *Davis,* the Supreme Court held that a merely technical or innocent conversion or one under mistake does not strictly constitute a willful and malicious conversion.

> But, a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstance. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice [citation omitted]. There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one. *Davis, supra* 55 S.Ct. at 153.

Thereupon, *Hodges* interprets *Davis* to hold that since every conversion does not constitute a willful and malicious injury, "that malice must encompass 'an intent to harm' the creditor." *Hodges* at 516.

Those cases which hold an "intent to harm standard" for the malicious requirement of § 523(a)(6) are based on the *Hodges* interpretation that Congress completely obviated the *Tinker* standard. Similarly, they have adopted the view that *Davis* held an "intent to do harm" standard. Many of these courts feel compelled to adhere to this standard because they deem it to represent legislative intent. However, many courts have expressed considerable dissatisfaction with the interpretation. The main thrust of the criticism is that, in the context of a debtor who disposes of encumbered property prior to bankruptcy, adherence to a rigid standard of malice effectually denies the secured creditor his very security in the property by placing a nearly impossible burden on him to prove a subjective intent by the debtor to do harm.

In following the "intent to do harm" standard enunciated in *Hodges,* because it "correctly reads the intent of Congress," the Court *In the Matter of Nelson,* 10 B.R. 691, 4 CBC 2d 548 (Bkrtcy.N.D.Ill.1981) notes:

> The *Hodges* case places an almost insurmountable burden on the creditors when their secured property is sold, and a burden this court is not entirely comfortable with. *Id.* at 549.

> When the injury is directly to a person or the property of another, a standard of intentional harm is understandable.... But when the injury is conversion of secured property, such a standard virtually renders the remedy meaningless. Under what circumstances, for instance, would a debtor ever sell secured property out of malice? *Id.* at 549.

> With serious reservations about the ease with which debtors can avoid the non-dischargeability of a debt after conversion of property subject to a security interest, the Court followed Hodges,.... *Id.* at 550.

Also, *In the Matter of Lewis,* 17 B.R. 46 (Bkrtcy.W.D.Ark.1981), the Court recognized the difficulty in proving subjective malice, yet grudgingly applied the "intent to do harm" standard. *Lewis* points out that in consequence of the Committee Report which overruled the "reckless disregard" standard of *Tinker,* the Courts:

> have commenced to apply a rigid subjective standard which all but rules out the plaintiffs ability to prove willfulness and malice except by the defendant's own admission.... Regardless of the seeming unfairness of this new rule, which appears to abolish section 523(a)(6) of the Code as a meaningful ground of non-dischargeability, this court can only apply the law which is applicable. No court can be wiser than the law which it is bound to effect. *Id.* at 48, 49.

In fact, the Memorandum Opinion of the case which is now before this Court on appeal notes:

> This Court is somewhat uncomfortable with the "intent to harm" standard because it is difficult to imagine how the standard could ever be applied in the typical commercial situation when a debtor wrongfully sells or disposes of property

subject to a security interest. 35 B.R. 763, 764 (Bkrtcy.N.D.Ill.W.D.1983).

The opinion points out the implied malice standard "may produce commendable results, but appears to fly in the face of the House and Senate Reports." *Id.*, p. 764.

In more recent case law, dissatisfaction with the *Hodges* standard has led to a marked tendency by the courts to follow the intentional and deliberate definition of willful, but to strain to avoid what they view as the harsh and unfair results of the "intent to do harm" definition of malice. In general these cases seek to circumvent the apparent Congressional intent to obviate the *Tinker* standard and to apply the implied or constructive malice standard to the malicious requirement. This result is achieved through three distinct approaches.

One approach is not to consult the legislative history as was done by the Court in *Credit Thrift of America v. Auvenshine,* 9 B.R. 772 (Bkrtcy.W.D.Mich.1981). *See also In re Klix,* 23 B.R. 187, 7 CBC 2d 276 (Bkrtcy.E.D.Mich.1982). In *Auvenshine,* a secured creditor filed a complaint for a determination that his claim against the debtor was non-dischargeable under § 523(a)(6). The debtor, relying on the legislative history accompanying § 523(a)(6), argued that the appropriate standard for "malicious" had been made more rigid under the new Code and required an "intent to do harm." The Court disagreed. The Bankruptcy Court acknowledged the *Hodges* interpretation of the legislative intent behind § 523(a)(6), but declined to follow *Hodges.* Noting that the precise language of the section under the Code is almost identical to the language of the original Bankruptcy Act construed by the Supreme Court in *Tinker* (respectively "willful and malicious injury by the debtor to another entity or to the property of another entity," and "willful and malicious injuries to the person or property of another"); the Court refused to utilize the legislative history in determining the intended meaning of § 523(a)(6). The Court reasoned that legislative history did not conclusively determine the meaning of a statute, rather it was a helpful tool when the legislative intent behind the statute was unclear. The Court noted that the Supreme Court in *Tinker* had interpreted language identical to that found in § 523(a)(6), hence, there was no lack of clarity in the meaning of "willful and malicious" under the Code. Finding no ambiguity in the meaning of the section, resort to legislative history was unnecessary. Willful was interpreted to mean intentional or deliberate, and the *Tinker* standard of malicious was held to be operative and controlling. *Auvenshine* at 775.

The *Auvenshine* approach correctly notes the similarity in the language of the exception construed by *Tinker* and that of the Code, but all too hastily dismisses the question of the legislative history which accompanied section 523(a)(6). If, in fact, *Hodges* correctly interpreted the legislative record to entail a complete overruling of the *Tinker* standards, then the *Auvenshine* Court does not have the authority to disregard that intent despite the similarity in language.

The second approach utilized by Bankruptcy Courts to mitigate the "intent to harm" standard of malice is to reconcile the conscious intent to do harm standard and the less stringent implied malice standard as two different interpretations of the "intent to do harm" standard. *E.g., Wisconsin Finance Co. v. Ries,* 22 B.R. 343 (Bkrtcy.W.D.Wis.1982); *In re Chambers,* 23 B.R. 206 (Bkrtcy.W.D.Wis.1982). In *Ries* the Bankruptcy Court notes that there is little difficulty in defining the term willful under § 523(a)(6) as intentional or deliberate; however, the Courts are split as to what constitutes "malice" where a debtor has willfully sold secured property. The Court contends that "malice" is property defined as "intent to harm" but that it can be interpreted in two ways; one requiring specific intent to harm the creditor, and the other requiring no showing of ill-will, rather only knowledge that his act will harm another and proceeds in the face of that knowledge. *Ries* at 346–7. In evaluating these two interpretations, the "special intent" standard is determined to be disad-

vantageous because it places an insurmountable burden on creditors to prove intent when their secured property is sold and denies the creditor a meaningful remedy under this section of the Code. Therefore, the Court applies the second looser standard, that the debtor must have knowledge that harm would result from his conduct and that the debtor's knowledge may be inferred. *Id.* at 347.

This approach is essentially an application of the *Tinker* standard of implied malice, but in the guise of an interpretation of an "intent to do harm" standard. The approach successfully avoids the disadvantages of the "intent to do harm" standard without dealing directly with the question of the legislative intent behind the exception.

The third approach seems to be the predominent one, and it entails a re-examination of the legislation record behind § 523(a)(6). These cases take account of *Tinker's* dual holding and find that Congress intended to overrule only *Tinker's* first holding, that a "reckless disregard" standard can satisfy the "willful" requirement. Congress did not, these courts reason, intend to disturb *Tinker's* definition of the "malice" requirement. *In re Fussell,* 15 B.R. 1016 (D.C.W.D.Va.1981); *In re McCloud,* 7 B.R. 819 (Bkrtcy.M.D.Tenn. 1980); *In re DeRosa,* 20 B.R. 307 (Bkrtcy.S. D.N.Y.1982); *In the Matter of Klix,* 23 B.R. 187, 7 CBC 2d 276 (Bkrtcy.E.D.Mich.1982).

The District Court in *United Bank of Virginia v. Fussell,* 15 B.R. 1016 (D.C.W.D. Va.1981), followed this approach. In *Fussell,* the Bank appealed from a Bankruptcy Court decision which held that a debt owed the bank by the debtor was dischargeable under § 523(a)(6) of the Code. The District Court reversed, finding that the debtor used his position as corporate president to obtain repayment of personal loans he had made to the corporation in direct contravention of a subrogation agreement with the bank. The Court held debtor's loan repayments constituted willful and malicious injury to the Bank's subrogated interest and

was therefore non-dischargeable in bankruptcy.

The Court reasoned that under the new Code, the "reckless disregard" definition overruled by Congress applied only to the "willful" requirement. The Court held that the Code did not statutorily alter the *Tinker* definition of "malicious." Nor did it find anything in the legislative history of the section to suggest that Congress intended to overrule the *Tinker* courts interpretation of "malicious." *Fussell* at 1022.

This court believes that *Fussell* represents an accurate reading of the legislative intent underlying this exception. We, therefore, accept the *Fussell* standard of implied or constructive malice for the following reasons: (1) Congress did not intend to overrule the standard of implied malice as set out in *Tinker;* (2) *Davis* does not hold an "intent to do harm" standard for malice in contrast to the standard delineated in *Tinker;* and (3) the standard of implied malice is strongly recommended by public policy.

A careful reading of the Committee Report on § 523(a)(6) indicates that Congress clearly intended to overrule those cases which relied on *Tinker* to apply a "reckless disregard" standard to the term *willful.* Willful is to mean "intentional" or "deliberate." The troublesome passage from the Committee Report reads:

> Paragraph (6) excepts debts for willful and malicious injury by the debtor to another person or to the property of another person. *Under this paragraph, willful means deliberate or intentional. To the extent that Tinker v. Colwell [citations omitted] held that a looser standard is intended, and to the extent that other cases have relied on Tinker to apply a reckless disregard standard, they are overruled.* Sen.Rept. No. 95–989, 95th Cong., 2d Sess. (1978), 77–79, U.S.Code Cong. & Admin.News 1978, 5787, 5865; also House Rept. No. 95–595, 95th Cong., 1st Sess. (1977), p. 363, U.S.Code Cong. & Admin.News 1978, 5787.

This comment defines willful and indicates that to the extent *Tinker* has been inter-

preted to stand for a looser standard of willful, those cases are overruled. In reality, Congress is overruling one of the dual holdings of *Tinker*—the one which applies to the willful requirement.

There is no clear indication that Congress intended to overrule those cases interpreting *Tinker* as a malice holding. *Tinker* specifically adopted a standard of implied malice and expressly rejected an "intent to harm" standard. Moreover, the legislative record itself indicates that a specific "intent to do harm" is contrary to Congressional intent.

> The intent is to include in the category of nondischargeable debts a conversion under which the debtor willfully and maliciously intends to borrow property for a short period of time *with no intent to inflict injury but in which injury is in fact inflicted.*

*In re Scotella,* 18 B.R. 975, 977 (Bkrtcy.N.D. Ill.1982) *citing* H.R. No. 95–595, 95th Cong., 1st Sess. (1977), p. 364, U.S.Code Cong. & Admin.News, 1978, 6320. A situation in which a debtor sells secured property knowing that the sale would injure the creditor by depriving him of his collateral and proceeds in the face of that knowledge is the type of debt Congress intended to make non-dischargeable under § 523(a)(6). *In re Scotella, supra* at 977. This is consistent with the type of debt deemed non-dischargeable under the parallel exception of the old Act, "if the act of conversion is done deliberately and intentionally in *knowing disregard of the rights of another, it falls within the statutory exclusion even though there may be an absence of special malice." Bennett v. W.T. Grant Co., supra* at 665.[2]

Secondly, this court disagrees with the *Hodges* view that *Davis v. Aetna, supra,* represents "non-Tinker law" and holds an "intent to do harm" standard for malicious under this exception. To the contrary, this court believes the *Davis* holding is consistent with the *Tinker* standard of implied malice. *Davis* held that every instance of conversion did not automatically establish a willful and malicious conversion which would except the debt from discharge. In *Davis,* an auto dealer borrowed money from Aetna to finance the purchase of an automobile. The dealer secured the loan by giving the lender a promissory note, a chattel mortgage, a trust receipt agreeing to hold the car as the lender's for storage and agreeing not to sell, pledge, or otherwise dispose of the car without the lender's consent, and a bill of sale. The findings of fact revealed the automobile was sold off the showroom floor by one of the dealers salesmen, without concealment, in the ordinary course of buisness, and without written consent. There was testimony that the dealer notified Aetna of the sale on the day it took place. Further it was established by testimony that on many occasions cars held upon like terms had been sold without express consent and the proceeds accounted for thereafter. In this case the proceeds of the sale were not turned over to Aetna but funnelled back into the business. The dealer soon after declared bankruptcy.

The Supreme Court held that the debt owed Aetna was dischargeable in bankruptcy reasoning:

> There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. [citations omitted] There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one. Turning to the findings here, we see that willfulness and malice have been unmistakably excluded. *Davis,* 55 S.Ct. at 153.

---

**2.** The *Hodges* Court held that *the knowing disregard* standard of *Bennett* was overruled by Congressional intent. This court disagrees. First, *Hodges* cites the Committee Report which reads that the "reckless disregard" standard of *Tinker* is overruled and thus erroneously equates "reckless disregard" with "knowing disregard" as held in *Bennett.* Second, it is clear that the passage *Hodges'* relies on overrules the reckless disregard standard as it applies to willful and not to malicious. The knowing disregard standard of *Bennett* satisfies the maliciousness requirement.

In *Davis* there was a technical or innocent conversion represented by the fact that the automobile was sold without written consent and the proceeds retained, but there existed no "aggravated features", 55 S.Ct. at 153, to constitute willful and malicious conversion. The sale was made without concealment and Aetna was notified of the sale on the same day. Most importantly the car was sold in the ordinary course of business and on many other occasions, perhaps even customarily, cars held upon the same terms had been sold without express consent and the proceeds accounted for later. This fact suggests the conversion was "honest but mistaken" seemingly "engendered by a course of dealing, that powers have been enlarged or incapacities removed."

*Davis* is merely an example of an innocent or mistaken conversion and as such, dischargeability of the debt in bankruptcy is consistent with the policy that the innocent or honest debtor is to be relieved in bankruptcy and not the malicious wrongdoer. See also *In re Roberts*, 8 B.R. 291 (D.C.W.D.Mo.1981) (a good faith mistake precludes a malicious intent).

Moreover, the *Davis* holding is consistent with the *Tinker* standard of implied malice and does not hold an "intent to do harm" standard. A careful reading of *Tinker* reveals that *Davis* in fact is directly drawn from the *Tinker* interpretation of this exception. The *Tinker* Court held:

> It is not necessary in the construction we give to the language of the exception in the statute to hold that every willful act which is wrong implies malice.

*Tinker* 24 S.Ct. at 510. *Tinker* explains that a negligent act, though wrongful, would not be within the exception, but the same act done intentionally "would certainly be malicious. . . ." *Tinker* 24 S.Ct. at 510.

*Davis*, therefore, is not, as *Hodges* suggests, a Supreme Court enunciated alternative standard to the implied malice standard of *Tinker;* rather, it is a consistent interpretation of the exception for willful and malicious injury.

Finally, the implied malice standard of *Tinker* is a favored interpretation because it is consistent with the policy historically underlying this exception to bankruptcy. It was an honest debtor, and not a malicious wrongdoer, that was to be discharged. *Tinker, supra* 24 S.Ct. at 509. Under the *Tinker* standard, malice may be inferred from the nature and conduct of the act itself which allows the court to fairly evaluate all the factors of a situation. In the commercial context, the rigid and subjective "intent to do harm" standard makes it nearly impossible to prove malice except by the debtor's own admission and makes it too easy for the debtor to avoid the non-dischargeability of a debt after conversion of property subject to a security interest.

The implied malice standard of *Tinker* also is in harmony with the policy underlying the preferred position of secured creditors in bankruptcy proceedings. It protects the integrity of secured property and does not render the security agreement a meaningless instrument. A rigid "intent to harm standard" effectually denies the secured creditor his very security in the property by placing a nearly impossible burden on him to prove a subjective intent by the debtor to do him or his property harm. It permits a debtor's financial difficulties to serve as both justification for the conversion of collateral and a rebuttal to a requirement of an intent to harm the creditor. When a creditor takes all appropriate steps to secure his interest in an agreement, the law will protect those efforts.

For these reasons, this court holds that in the context of a debtor who sells encumbered property prior to bankruptcy, "willful and malicious injury" means a deliberate or intentional act in which the debtor knows his act would harm the creditors interest and proceeds in the fact of the knowledge. The debtor's knowledge may be inferred from his experience in business, his concealment of the sales, his admission that he had read the security agreement which forbid the sale or that he understood what was meant by the term security agreement and collateral used as security. *In re Ries*, 22

B.R. 343, 347 (Bkrtcy.W.D.Wis.1982); *In re Klix,* 23 B.R. 187, 7 CBC 2d 276, 280 (Bkrtcy.E.D.Mich.1982); *In re Donofrio,* 19 B.R. 734, 736 (Bkrtcy.W.D.Ohio 1982); *In re Scotella,* 18 B.R. 975, 977 (Bkrtcy.N.D.Ill. 1982). A merely technical or innocent conversion, or one under mistake, absent aggravated features does not strictly constitute "willful and malicious injury." *Davis v. Aetna, supra* 55 S.Ct. at 153.

For the aforementioned reasons, the court holds that the bankruptcy judge erred in applying an "intent to do harm" standard to the term malicious under § 523(a)(6). The case on appeal is remanded for further proceedings not inconsistent with this opinion.