**In re Lorn D. & Shirley J. WOOLNER, Debtors.**

**George S. MATHES & Betty H. Mathes, Plaintiffs,**

**v.**

**Lorn D. WOOLNER & Shirley J. Woolner, Defendants.**

**Bankruptcy No. 88–12274.
Adv. No. 89–1119.**

United States Bankruptcy Court, E.D. Michigan, N.D.

Jan. 23, 1990.

Kallas, Lower, Henk & Treado, P.C., Bloomfield Hills, by Scott L. Feuer, for plaintiffs.

Carl L. Bekofske, Flint, Mich., for defendants.

MEMORANDUM OPINION AFTER TRIAL OF ADVERSARY PROCEEDING

ARTHUR J. SPECTOR, Bankruptcy Judge.

In this lawsuit, the plaintiffs seek a determination that the debt due them arising from the diminution in market value of the farm and home they sold to the debtors is excepted from the debtors' discharge in

bankruptcy pursuant to 11 U.S.C. § 523(a)(6), which states:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity ...

Although the plaintiffs concede that the defendants did not purposely set out to harm them and did not intentionally destroy the premises, they nonetheless contend that the defendants acted or omitted to act intentionally and that harm therefrom was foreseeable. They contend that such a showing is sufficient to establish an exception to discharge under § 523(a)(6). Their argument rests upon *Perkins v. Scharffe (In re Scharffe)*, 817 F.2d 392 (6th Cir.1987). For the reasons which follow, we hold that *Scharffe* does not stand for the proposition ascribed to it, and therefore, that the plaintiffs have no cause for action under § 523(a)(6). The following are the Court's findings of facts and conclusions of law as required by Bankruptcy Rule 7052.

## FACTS

On June 25, 1981, the plaintiffs, George ("Buck") and Betty Mathes, sold their home and dairy farm in Chuckey, Tennessee, to the defendants, Lorn and Shirley Woolner. The defendants paid $90,000 down at the time of the purchase and delivered their promissory note secured by a deed of trust on the premises sold. The sale occurred at about the peak of the market for farm real estate prices. Despite the hard economic times which followed the purchase, the defendants never missed a payment to the plaintiffs. The defendants also entirely paid off a $50,000 purchase money debt due the plaintiffs for the livestock which the defendants bought when they purchased the farm. Despite Mr. Woolner's working full time off the farm as a millwright, the reduction in the price of milk combined with the 1986 drought proved too much for the defendants. After paying off all of their debts in Tennessee, the defendants surrendered the farm back to the plaintiffs and returned to Michigan, their former home state. The plaintiffs nonetheless foreclosed the deed of trust. The trustee sold the premises at auction for far less than the balance still due on the note. The deficiency of $124,531.14 was reduced to a money judgment. That judgment followed the defendants to Michigan as the plaintiffs obtained a local judgment on the judgment in the amount of $139,601.02. The plaintiffs seek a determination that of this balance owing, $84,312.00 should be held to be nondischargeable because it represents the amount of their loss caused by the defendants' reckless stewardship of the premises. They determine this balance solely by a comparison of what they received at the auction sale against what an appraiser said the property could have sold for had the property been in decent shape.

Most of the time at trial was spent in comparisons between the physical condition of the property in 1981, when the defendants entered into possession and November 11, 1986, when they abandoned it. The plaintiffs painted an exceedingly depressing picture and ascribed the depreciation mostly to poor housekeeping, slovenly living and a simple lack of care. No malice or ill will was alleged. On cross-examination, the plaintiffs conceded that the defendants were hard workers and that a farmer will typically shirk on maintenance when cash flow becomes a problem. The defendants, not surprisingly, had an entirely different view of the matter. For example, according to them, the fence which the plaintiffs complained had not been maintained, was 50 years old, and they upgraded it. The home itself was 100 years old and the defendants put a new roof on it during their occupancy. The sharp factual disputes go on and on through at least items "a" through "q" itemized in the complaint. The details of the damages are tedious and blessedly irrelevant given the outcome of this case. The plaintiffs laid great weight on the fact that a dairy farm must be kept in tip top condition to retain its Grade A rating. The strongest evidence in support of the defendants' position was that the

farm never lost its Grade A rating. As bad as this property was supposed to have been, the plaintiffs offered no photographs. This could have been important if the case had turned on this issue as the descriptions of the property were so contradictory. Furthermore, the plaintiffs were unable to establish the amount of damages using the market depreciation theory. Instead, their sole credible evidence establishing property damage consisted of bills for repairs amounting to a mere $1,281.98.

## DISCUSSION

The plaintiffs can be forgiven for thinking that *Scharffe* supports non-dischargeability for simple negligence. In order to maintain "uniformity" among the circuits on the issue of whether a debt is non-dischargeable where no intention to harm the creditor is established, the Sixth Circuit followed *In re Franklin*, 726 F.2d 606 (10th Cir.1984). *See Scharffe*, 817 F.2d at 395 (Engel, C.J. concurring).

*Franklin* and *Scharffe* involved medical professionals who committed malpractice. In each case, the court found no intent to harm the patient, but concluded that the conduct in question was so egregious that it was, in essence, the equivalent of willful and malicious conduct. It is easy to draw from these cases the conclusion that if malpractice is gross enough, it is the functional equivalent of an intent to harm the patient. Since malpractice is nothing more than a species of negligence, it is no great leap to say generally that *Scharffe* supports a claim of non-dischargeability as to any liability arising from negligence if the negligence is gross enough to be labeled "appalling". Of course, if that is the law, there is no need for a listing of specific types of actions which are excepted from

discharge; § 523(a) need only state: "Debts arising from appalling conduct are not discharged," leaving each trier of fact to make an *ad hoc* value judgment as to whether the conduct is "appalling" or, stated differently, whether the conduct constitutes "gross negligence". This can't be the law; yet, such reasoning does follow quite easily from the sparse reasoning in both *Scharffe* and *Franklin*.

Much of the confusion regarding the scope of § 523(a)(6) may stem from the apparent discrepancy between the definition of "willful and malicious" which has been espoused by the circuit courts and the manner in which they applied this definition to the facts at hand. The court in *Scharffe* states that a "wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury." 817 F.2d at 394 (*quoting* 3 *Collier on Bankruptcy*, ¶ 523–111 (15th ed. 1986)). This definition is consistent with the generally accepted formulation of an intentional tort.[1] A cursory look at *Scharffe*, however, suggests that the court applied a looser definition to the facts before it.

*Scharffe* involved a podiatrist who was alleged to have administered an unnecessary and unsterile injection to a patient, to have failed to order lab tests in a timely manner, and then to have disregarded belated lab results which indicated that an alternate course of treatment was appropriate. 817 F.2d at 393. Relying largely on *Franklin*, the Sixth Circuit held that the debt resulting from Dr. Scharffe's malpractice was non-dischargeable. However, the conduct in question appears to more properly be characterized as reckless rather than "willful and malicious".[2] In fact,

---

**1.** The term "intent" is used by the Restatement to "denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Restatement (Second) of Torts*, § 8(a). *Scharffe* did not require proof that the actor actually intended to cause the resulting injury. 817 F.2d at 394. Stated somewhat differently, and using the terminology of the Restatement, *Scharffe* held, in effect, that the actor's "belief" that the harm is substantially cer-

tain to occur can be inferred from the nature of the act. *Cf. United Bank of Southgate v. Nelson*, 35 B.R. 766, 11 B.C.D. 159, 9 C.B.C.2d 745 (N.D. Ill.1983); *In the Matter of Klix*, 23 B.R. 187, 7 C.B.C.2d 276 (Bankr.E.D.Mich.1982).

**2.** In contrast to the "substantially certain" standard applicable to an intentional tort, recklessness requires a finding that there is a "strong probability" that the conduct in question will result in harm. Restatement (Second) of Torts, § 500, comment f. *Cf. Prosser, The Law of*

Judge Engel indicated in his concurring opinion that Dr. Scharffe's conduct actually constituted "reckless disregard" and, as such, should properly be held dischargeable. 817 F.2d at 395 (Engel, J., concurring). Judge Engel based his conclusion on the legislative history of § 523(a)(6), which purports to "overrule" pre-Code cases that applied a "reckless disregard" standard when determining the dischargeability of liability resulting from allegedly willful and malicious conduct. *Id.* Judge Engel nevertheless concurred in the court's determination of non-dischargeability, citing precedent established by previous circuit court opinions.[3] *Id.*

The problem with *Scharffe* is the signal it sends. On the surface it appears that the court essentially applied a "reckless disregard" standard in the face of legislative history evincing a desire to impose a stricter standard,[4] thereby creating a "slippery slope" that Congress presumably sought to avoid.[5] On the surface, the facts in *Scharffe* "sound like" negligence (even if "appalling" or "gross"), but the court nonetheless concluded that the resulting liability was non-dischargeable based on a standard that purports to be much stricter than one of negligence or recklessness.

The apparent tension between the facts of *Scharffe* and the holding is largely reconciled, however, by a careful reading of the file contents and lower court opinions in that case. These records indicate that there was evidence to support a finding that the injection at issue was totally unnecessary, and that Dr. Scharffe's sole motive for administering the medication was to bill the patient's insurer.[6] Since billing an insurance carrier for an unnecessary procedure is not a "just" cause or excuse, malice can be inferred.

The evidence also supported a finding that Dr. Scharffe knowingly refused to administer the proper medication in the proper dosages. As the lab had identified the infection and the recommended medication, Dr. Scharffe's voluntary choice not to follow the recommendation but to continue the inappropriate course of treatment was intentional, i.e., willful. It was malicious because the evidence supported a finding that the reason Dr. Scharffe did not follow the recommended treatment was because

Torts, at 185 (4th ed. 1971) (stating that the "usual meaning assigned to ... 'reckless' ... is that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." (citations omitted)).

3. It is ironic that the uniformity among the circuit courts which Judge Engel said the court sought to maintain did not actually exist. Two circuits—the Tenth and the Eighth—had held that non-dischargeability under § 523(a)(6) requires proof of an intent to injure. *In re Compos,* 768 F.2d 1155 (10th Cir.1985); *In re Long,* 774 F.2d 875 (8th Cir.1985). This holding, of course, is contrary to the Tenth Circuit's earlier decision in *Franklin,* as well as the Ninth Circuit's holding in *In re Cecchini,* 780 F.2d 1440 (9th Cir.1986). The court in *Scharffe* cites neither *Compos* nor *Long;* the lack of attention given to these cases may be attributable to the fact that, notwithstanding the notation in the reported decision, Dr. Scharffe was not represented by counsel in the appeal, and no appellee's brief was filed.

4. Many lower courts chose to disregard the legislative history to which Judge Engel made reference, and continued to apply a "reckless dis-

regard" standard. *See generally Comment,* Accidental "Willful and Malicious Injury": The Intoxicated Driver and § 523(a)(6), Bankr.Dev.J., 135, 142–44 (1984). This was presumably not the intent of the Sixth Circuit, particularly since the circuit court opinions which *Scharffe* purports to follow have explicitly heeded Congress' admonition. *See, e.g., In re Cecchini, supra* note 3, at 1443; *Matter of Quezada,* 718 F.2d 121, 122 (5th Cir.1983). *See also Wheeler v. Laudani,* 783 F.2d 610 (6th Cir.1986) (liability arising from libelous statements made in reckless disregard as to their truth or falsity would be dischargeable in bankruptcy).

5. The distinction between "reckless disregard" and "gross negligence" (or even "ordinary" negligence) is often a very difficult one to make. *See generally Prosser, The Law of Torts,* 183–85 (4th ed. 1971). The sometimes arbitrary lines that must be drawn may therefore result in inconsistent and unpredictable decisions by the courts.

6. The act of administering an injection that is not medically indicated is clearly outside the scope of the patient's consent to treatment, and thus constitutes an assault and battery. *Cf. Shulman v. Lerner,* 2 Mich.App. 705, 141 N.W.2d 348 (1966).

he could not administer "hospital strength" antibiotics which required intravenous administration. To give the patient the appropriate treatment, Dr. Scharffe would have had to refer her to a physician with hospital admitting privileges. It was fair to infer that the reason Dr. Scharffe did not refer the patient to a physician but instead chose to continue to treat her with insufficient doses of medication was to conceal the nature of the earlier malpractice. Such a motive, of course, is not just cause for continuing what the doctor knew to be inadequate treatment.

The trial record would therefore support findings that Dr. Scharffe knew that his acts would cause his patient injury yet proceeded in the face of this knowledge and violated his duty to the patient by: (a) injecting her needlessly with a needle without following sterile procedures, (b) continuing to refuse her proper treatment, and (c) keeping her from those who might provide her with proper treatment. *Cf. Franklin*, 726 F.2d at 610 (where the court notes that Dr. Franklin covered up records relating to his alleged malpractice). This evidence demonstrates that *Scharffe* involved more than negligence or recklessness and may explain how the Sixth Circuit formed its conclusion that this liability was not dischargeable. Given the full circumstances surrounding Dr. Scharffe's conduct, it can be seen that *Scharffe* does not support the contention that negligence or recklessness falls within the scope of § 523(a)(6).

■ Having concluded that *Scharffe* does not stand for the proposition that § 523(a)(6) encompasses negligent or reckless conduct, the question remains as to just what does constitute willful and malicious conduct. This Court is of the opinion that willful and malicious conduct is best defined as an act, done intentionally and without just cause or excuse, which the actor knows is substantially certain to result in harm to another. Consistent with the Sixth Circuit's holding in *Scharffe*, a specific intent to bring about the resulting harm need not be shown; the actor's knowledge that the act will necessarily result in harm can be inferred from the nature and circumstances of the act. *See United Bank of Southgate v. Nelson*, 35 B.R. 766, 11 B.C.D. 159, 9 C.B.C.2d 745 (N.D.Ill.1983); *In the Matter of Klix*, 23 B.R. 187, 7 C.B.C.2d 276 (Bankr.E.D.Mich. 1982). This definition is consistent with *Scharffe*, and avoids the problems relating to the use of the term "wrongful" in defining willful and malicious conduct.[7]

■ In contrast to the facts in *Scharffe*, it is obvious that the run-of-the-mill negligence case does not satisfy the criteria discussed above. A surgeon who inadvertently nicks an artery during a surgical procedure does not intend to commit the offensive act; it therefore becomes irrelevant—even silly—to inquire as to whether there was "just cause" for the action or if the harm was substantially certain to occur. If one focuses on the surgical procedure in its entirety, as opposed to isolating the act which resulted in injury, the surgeon has not acted with malice. Although he certainly "intends" to perform the procedure, there is typically "just cause" for the surgery and, in the ordinary negligence case, the surgery is not certain to result in harm to the patient. Taking the hypothetical a step further, a debt arising from the surgeon's malpractice would be dischargeable even if the mishap occurred because the surgeon was performing the operation with one hand while changing radio stations with the other. Such conduct would be reckless, but it would not necessarily result in harm to the patient and is therefore outside the scope of § 523(a)(6).

The Supreme Court's opinion in *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904)[8] provides insight as to the

7. *See* Comment, *supra* note 4, at 145 (noting that the adjective "wrongful" is conclusory and offers nothing in the way of guidance for the court in making its determination).

8. Although decided under the Bankruptcy Act of 1898, *Tinker* construed a provision which, like § 523(a)(6) of the Code, excepted from discharge liabilities arising from "willful and malicious" injury to another. 11 U.S.C. § 35(a)(8) (repealed 1978). Those courts which, like *Scharffe*, have held that willful and malicious conduct does not require a specific intent to

type of conduct which can properly be deemed willful and malicious. The Supreme Court noted that a person who poisons a fishery or maims cattle acts out of malice, even if the actor does not know the owner of the property. 193 U.S. at 486, 24 S.Ct. at 508. In contrast to the malpractice hypotheticals discussed above, the act of maiming cattle or poisoning a fishery is substantially certain to result in injury, and is therefore willful and malicious. It is easy to describe such a ne'er-do-well as a *"malicious* so-and-so". Based on the unique facts of the case, the Sixth Circuit held that Dr. Scharffe fit within this narrow class. As stated, we believe that the Woolners do not.

## APPLICATION OF THE STANDARD TO THE FACTS IN THIS CASE

The plaintiffs in this case allege in essence that the defendants' neglect caused the premises to depreciate in value. Even if the plaintiffs' proofs are accepted as true, however, this neglect does not constitute willful and malicious conduct. It is difficult to argue that the defendants "intentionally"—consciously—chose to neglect the property. After all, when this alleged neglect occurred, the defendants were the absolute owners of the property. They made each of their payments to the plaintiffs and had every expectation of residing at and farming the premises indefinitely.

Even if they did choose to neglect the property, there is ample evidence from which to conclude that the defendants' inadequate stewardship was excusable. The defendants were in dire financial straits, and, as a consequence, were forced to make hard decisions regarding the use of their limited time and money. As previously noted, the plaintiffs themselves acknowledge that maintenance is likely to be given low priority under such circumstances.

Finally, it cannot reasonably be claimed that the defendants' alleged neglect was substantially certain to harm the plaintiffs. Even if one accepts the premise that depreciation as a result of the lack of mainte-

nance was inevitable, there is nothing certain with respect to the extent or significance of the depreciation. In fact, it was entirely plausible that any such depreciation would not have been so substantial as to result in a deficiency following the trustee's sale of the premises, in which event the plaintiffs would have suffered no harm at all.

Based on the foregoing, it is obvious that the defendants' conduct constituted only passive negligence, if indeed the defendants were negligent at all. There is certainly no basis for concluding that the conduct in question was willful and malicious. Accordingly, a judgment in favor of the defendants will enter forthwith.

injure have generally cited *Tinker* in support of that conclusion. *See e.g., United Bank of South-*

*gate v. Nelson, supra* note 1; *In the Matter of Klix, supra* note 1.