**In re Marcus Lee ADAMS, Debtor.**

**Todd SPARKS, Plaintiff,**

**v.**

**Marcus Lee ADAMS, Defendant.**

**Bankruptcy No. 91–82000.
Adv. No. 91–8501.**

United States Bankruptcy Court,
W.D. Michigan.

Nov. 4, 1992.

Lawrence P. Nolan, for plaintiff.

David S. Feinberg, for defendant.

---

1. Unless otherwise noted, all future statutory references are to Title 11 of the United States Code, sometimes referred to as the "Bankruptcy Code" or "Code".

2. The exhibits are as follows: a certified copy of a Certificate of Title for a 1975 Cadillac owned by the Debtor (Plaintiff's Exhibit 1); designated portions of a certified copy of the driving record

## OPINION REGARDING DISCHARGEABILITY OF DEBT

JAMES D. GREGG, Bankruptcy Judge.

### I. ISSUE

The sole issue before the court is to determine whether a judgment debt is non-dischargeable as a "willful and malicious injury" pursuant to 11 U.S.C. § 523(a)(6)[1].

### II. JURISDICTION

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. This matter is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(I) and (O). The court has authority to enter a final order in this adversary proceeding. 28 U.S.C. § 157(c)(2). The following constitutes the court's findings of fact and conclusions of law. FED.R.BANKR.P. 7052.

### III. PROCEDURAL BACKGROUND

The Defendant, Marcus Lee Adams (herein "Debtor"), filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on April 8, 1991. On June 14, 1991, the chapter 7 trustee filed a Report of No Assets and a Notice of Intent to Abandon All Property of the Estate. An order discharging the Debtor was signed and docketed by the court on August 12, 1991.

This adversary proceeding was filed by the Plaintiff, Todd Sparks (herein "Sparks"), on July 22, 1991 to determine whether a default judgment obtained against the Debtor in state court is nondischargeable pursuant to § 523(a)(6). A trial was held on September 28, 1992. At the trial, the court received into evidence five exhibits[2], heard testimony from three wit-

of the Debtor (Plaintiff's Exhibit 2); a copy of a state court criminal judgment of sentence against the Debtor dated November 6, 1985 (Plaintiff's Exhibit 4); a certified copy of a state civil judgment against the Debtor dated November 30, 1987 (Plaintiff's Exhibit 6); and a police diagram of an automobile collision scene (Plaintiff's Exhibit 7).

nesses[3], and listened to argument of counsel.

## IV. FACTS

On Friday, November 30, 1984, at approximately 3:00 p.m., the Debtor and Sparks were involved in a serious automobile collision at the intersection of West Mt. Hope and South Logan Street in Lansing, Michigan. This is a major intersection which, depending on the time of day, can be extremely busy with vehicle traffic. West Mt. Hope is a four lane road with two lanes running eastbound and two lanes running westbound. South Logan Street is a six lane highway running north to south; the northbound and southbound lanes are divided by a grass median. (Plaintiff's Exhibit 7.) There is a stop signal at the intersection and the speed limit is thirty-five miles per hour. Donald Knechtel, a police officer with the City of Lansing (herein "Officer Knechtel"), testified that traffic at this intersection is typically medium to heavy at 3:00 p.m. on a Friday due to a shift change at a nearby Oldsmobile plant.

Immediately before the collision, Sparks was stopped in the right curb lane heading east on West Mt. Hope waiting for the stop signal to turn green. Sparks was operating a mid-sized 1978 Ford or Mercury. The Debtor was driving a 1975 Cadillac travelling south on South Logan Street. After the stop signal changed to green and Sparks proceeded into the intersection, the Debtor collided into the front driver's side of Sparks' automobile where the southbound lane of South Logan Street and the eastbound lane of West Mt. Hope intersect. At the moment of impact, the Debtor was driving in the left curb lane of southbound South Logan Street and Sparks was driving in the right curb lane of eastbound West Mt. Hope. The impact of the collision caused Sparks' automobile to change direction from east to northeast. Sparks' automobile was forced over the curb, across the sidewalk, and finally came to rest on a grassy knoll in the median. After the collision, the Debtor's automobile moved across the grass median, knocking down an electronic walk/don't walk signal post, and coming to rest in the northbound lane of South Logan Street. (Plaintiff's Exhibit 7.)

Although it is undisputed the incident occurred, the evidence is contradictory regarding the events preceding the collision. The Debtor testified he was driving in the left curb lane of southbound South Logan Street. As he entered the intersection, he testified the signal was changing from green to yellow. The Debtor claims he noticed Sparks entering the intersection and applied pressure to the Cadillac's brakes. The brakes did not respond and the collision resulted. The Debtor testified he did not drive in excess of the speed limit at any time prior to or during the collision. Additionally, the Debtor claims he was driving directly from work to his girlfriend's house and did not ingest any form of alcohol or drugs before the collision.

Sparks presented two witnesses regarding the events preceding the collision. Christopher Malish (herein "Malish"), who does not know either party, testified he was the driver of the car directly behind Sparks on West Mt. Hope. Malish was stopped facing eastbound at the intersection also waiting for the signal to turn green. After the signal turned green and Sparks proceeded into the intersection, he noticed a 1975 Cadillac approaching southbound in a center lane on South Logan Street. Malish testified the 1975 Cadillac swerved into the left curb lane of South Logan and accelerated as it entered the intersection. Subsequently, the 1975 Cadillac "broad-sided" Sparks' automobile. Malish opined the 1975 Cadillac was travelling in excess of fifty miles per hour at the time of the collision. Additionally, the 1975 Cadillac did not make any attempt to stop or decelerate through the intersection. Malish testified that after the collision the Debtor was glassy-eyed, slurring his speech, and walking unstably. Malish believes the Debtor had been drinking prior to the collision and was intoxicated.

---

**3.** The three witnesses were Christopher Malish, the Debtor and Donald Knechtel.

Officer Knechtel was called to the scene of the collision. Officer Knechtel has been a traffic reconstructionist since 1982. His duties include investigating serious accidents involving crippling injuries or loss of life. At the time of this collision, Officer Knechtel was the senior traffic reconstructionist and had conducted over 100 traffic collision investigations. The court found Officer Knechtel was qualified to give expert opinion testimony.

Officer Knechtel testified that, upon being called to a collision scene, he examines the total circumstances and works backwards in determining what actually occurred. Based on the high degree of vehicle penetration by the 1975 Cadillac into the passenger compartment of Sparks' automobile, the necessity to physically extricate Sparks from the automobile, the amount of force necessary to cause Sparks' automobile to completely change direction, the location of the initial contact between the automobiles compared with the location where the automobiles came to rest, and corroboration from witnesses to the collision, Officer Knechtel strongly opined the damage and injuries were the result of a high speed collision. Officer Knechtel concluded the Debtor was travelling in excess of fifty miles per hour, disregarded a red light, and crashed into Sparks' vehicle. Officer Knechtel also believes the Debtor had

been drinking prior to the collision. Notwithstanding this belief, there exists no persuasive evidence that a breathalyzer or blood test was administered to determine the Debtor's blood alcohol content.[4]

Sparks received serious injuries as a result of the collision. At the time of the collision, the Debtor did not have automobile insurance and was driving without a valid driver's license.[5] (Plaintiff's Exhibit 2.) The Debtor was subsequently charged and convicted of felonious driving.[6] (Plaintiff's Exhibit 4.)

After reviewing the exhibits, the testimony of the witnesses, and the demeanor of the witnesses, this court finds it absolutely impossible to accept the Debtor's account of the events which resulted in the collision. As testified to by Officer Knechtel, the amount of force necessary to redirect Sparks' automobile over the curb, across the sidewalk, and atop the grassy knoll indicates the Debtor was travelling in substantially excess of the speed limit. Additionally, the force necessary to propel the Debtor's automobile across the grass median knocking down an electronic walk/don't walk signal post corroborates the testimony that the Debtor was speeding.

The police diagram of the collision scene illustrates the Debtor disregarded a red light.

**4.** No alcohol tests were performed because the police officers at the scene believed the Debtor could be charged with a more serious crime than driving while intoxicated.

**5.** The Debtor testified he was unaware his insurance had expired prior to the collision. The Debtor knew his license was suspended at the

time of the accident but drove nevertheless because he needed transportation to and from work.

**6.** The Debtor's conviction of felonious driving was a result of a plea bargain. The Debtor consented to the plea bargain because it limited his imprisonment to a maximum of 90 days.

(Plaintiff's Exhibit 7.)[7] The amount of distance necessary for Sparks to travel from a dead stop to the left curb lane of southbound South Logan Street and the distance the Debtor needed to travel to cross the westbound lanes of West Mt. Hope to the point of impact mandates a finding the Debtor drove through a red light—not a yellow caution light. The only possible way Sparks could have been that far into the intersection at the moment of impact was if he proceeded while the signal was red. The uncontradicted testimony of Malish is Sparks waited to proceed into the intersection until after the signal changed green. Officer Knechtel testified the signal light was properly working. Therefore, the collision could have only occurred where the left curb lane of southbound South Logan and the right curb lane of eastbound West Mt. Hope intersect if the Debtor drove through the signal light which had been changed from yellow to red for a substantial time. Additionally, the court rejects the Debtor's testimony that he attempted to slow down. Malish's unbiased testimony that the Debtor "punched it", or accelerated, through the intersection is totally consistent with the results of the collision.

This court finds that on November 30, 1984, at approximately 3:00 p.m., the Debtor was travelling south on South Logan Street at a minimum rate of fifty miles per hour. After seeing the stop signal turn yellow as he continued to approach the intersection of South Logan Street and West Mt. Hope, the Debtor then swerved from a center lane into the left curb lane and accelerated through a red light colliding with Sparks who, by then, had reached the right curb lane of east bound West Mt.

**7.** Vehicle #1 is the Debtor's 1975 Cadillac. Vehicle #2 is Sparks' 1978 Ford or Mercury.

Hope. The Debtor made no attempt to decelerate or stop. The Debtor was driving without a license and without insurance.[8]

After the Debtor was convicted of felonious driving, Sparks commenced a state court civil proceeding against the Debtor seeking damages resulting from the collision. The state court civil proceeding was presented to a Mediation Panel, the Debtor failed to appear, and judgment was entered against him. (Plaintiff's Exhibit 6.) On November 30, 1987, the State of Michigan Circuit Court for Ingham County entered a final judgment against the Debtor in the amount of $150,000 together with interest. (Plaintiff's Exhibit 6.)

## V. DISCUSSION

Section 523(a)(6) states in pertinent part:
(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

    ....

    (6) for *willful and malicious injury* by the debtor to another entity or to the property of another entity....

11 U.S.C. § 523(a)(6) (emphasis added). Superficially, § 523(a)(6)'s language appears relatively straightforward. However, after reviewing pertinent legislative history and considering case law, construing the operative statutory phrase is difficult. The terms "willful" and "malicious" have been interpreted in a myriad of ways with sometimes confusing results. Some of the puzzlement *may* occur because a given court decides to be result-oriented due to a sympathetic fact situation. *See, e.g., Edgman v. Farfalla (Matter of Farfalla)*, 132 B.R. 628 (Bankr.D.Neb.1991) (debt arising from conviction of felony murder vehicle homicide held nondischargeable); *Crawford v. Dine (Matter of Dine)*, 116 B.R. 101 (Bankr.S.D.Ohio 1990) (fraudulent conduct of debtor including promising to marry creditor with the intent of depriving her of money and property held nondischargeable); *Stahl v. Lang (In re Lang)*, 108 B.R. 586 (Bankr.N.D.Ohio 1989) (debtor's deliberate placement of investors' individual retirement account savings in high risk investment created nondischargeable debt). Further confusion may result because the words "willful" and "malicious" have partially overlapping meanings.[9] Nevertheless, this court believes the appropriate analysis of § 523(a)(6) must consider the statute, legislative history, and precedent in determining the proper meanings for both "willful" and "malicious".

■ Because the statute is phrased in the conjunctive, for a debt to be nondischargeable under § 523(a)(6), the court must make separate findings that the resulting injury was both "willful" and "malicious". *First Nat'l Bank of Red Bud v. Kimzey (In re Kimzey)*, 761 F.2d 421, 424–25 (7th Cir.1985); *State Farm Mut. Auto. Ins. Co. v. Kupinsky (In re Kupinsky)*, 133 B.R. 993, 995 (Bankr.S.D.Ill.1991); *Matter of Whipple*, 138 B.R. 137, 139 (Bankr.S.D.Ga.1991); *Stewart v. Gargac (In re Gargac)*, 93 B.R. 549, 551 (Bankr.

---

**8.** There has been much testimony from the Debtor and Officer Knechtel regarding the condition of the 1975 Cadillac. The Debtor testified he was unaware the brakes were faulty and the tires were adequate. Officer Knechtel testified the brakes were faulty and the tires were legally bald. Because of the court's finding that the Debtor accelerated through the intersection and made no attempt to stop, the condition of 1975 Cadillac is irrelevant. The brakes and tires had nothing to do with the collision. The only cause of the collision was the Debtor's attempt to run kamikaze through a stop signal at a congested intersection on a Friday afternoon.

The court disbelieves the Debtor's testimony he attempted to stop by applying the brakes and that they may have malfunctioned. At one point, the Debtor testified he may have "missed" the brakes and hit the accelerator; the court does not believe such testimony.

**9.** One author astutely acknowledges that "malicious" acts are necessarily "willful" acts.

[T]he distinction between ... "willful" ... and "malicious" is unclear because malicious acts are necessarily willful. In other words, deciding whether an act is malicious must involve a determination of willfulness. Confusion arises as the cases refer to "willful" and "malicious" as two separate categories, ignoring the fact that malicious acts are a subset of willful acts. Jeff Weinberg, Comment, *Accidental "Willful and Malicious Injury": The Intoxicated Driver and Section 523(a)(6)*, 1 BANKR.DEV.J. 135, 145 n. 48 (1984) [hereinafter Weinberg].

N.D.Ohio 1988); *Rymer v. Stillwell* (*In re Stillwell*), 96 B.R. 102, 105 (Bankr. W.D.Ky.1988).

■ In *Grogan v. Garner*, the Supreme Court held that the burden of proof under § 523(a) is by a preponderance of the evidence. 498 U.S. 279, ——, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). Although the Sixth Circuit has not decided the issue, three other Circuit Courts of Appeals have held that *Grogan v. Garner* should be given retroactive effect.[10] *Graham v. Internal Revenue Serv.* (*In re Graham*), 973 F.2d 1089, 1101–02 (3d Cir.1992); *Melton v. Moore*, 964 F.2d 880, 882 (9th Cir.1992); *Luce v. First Equip. Leasing Corp.* (*Matter of Luce*), 960 F.2d 1277, 1281 (5th Cir.1992). This court agrees that *Grogan* should be given retroactive effect. Therefore, the burden of proof under § 523(a)(6) is by a preponderance of the evidence. *Whipple*, 138 B.R. at 139; *Farfalla*, 132 B.R. at 629; *Borg–Warner Acceptance Corp. v. Watkins* (*In re Watkins*), 90 B.R. 848, 857 (Bankr.E.D.Mich.1988).

#### A. *"Willful" Acts Under § 523(a)(6).*

■ As contrasted to other terms defined in § 101, "willful" is not defined in the Bankruptcy Code. In analyzing the "willful" element of § 523(a)(6), the legislative history gives some guidance. It states:

> Paragraph (6) excepts debts for willful and malicious injury by the debtor to another person or to the property of another person. Under this paragraph, *"willful" means deliberate or intentional.* To the extent that Tinker v. Colwell, 139 U.S. 473 (1902) [sic], held

that a looser standard is intended, and to the extent that other cases have relied on Tinker to apply a "reckless disregard" standard, they are overruled.[11]

H.R.REP. No. 595, 95th Cong., 1st Sess. 365 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6320–21 (emphasis added). Therefore, for an injury to be "willful" it must be the result of an intentional or deliberate act. Because the legislative history seeks to reject an application of a reckless disregard standard under the "willful" prong, and because "willful" is not a Code defined word with a "plain meaning", negligent, grossly negligent and reckless acts are not nondischargeable pursuant to § 523(a)(6). *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228–29 (6th Cir. 1991); *Perkins v. Scharffe*, 817 F.2d 392, 393–94 (6th Cir.), *cert. denied*, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 112 (1987); *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir.1986); *Mathes v. Woolner* (*In re Woolner*), 109 B.R. 250, 254 (Bankr.E.D.Mich. 1990).

According to legislative history and Sixth Circuit precedent, a "willful" act is necessarily an "intentional" act. Therefore, the issue becomes what is "intentional" under § 523(a)(6). In *Mathes v. Woolner*, Judge Spector, in interpreting *Scharffe*, analyzed the meaning of "intent" for § 523(a)(6) purposes. 109 B.R. at 252–54. Similar to many decisions under § 523(a)(6), the *Scharffe* case appears somewhat vague. Because of the Sixth Circuit's cursory review of the facts, the *Scharffe* decision could be incorrectly perceived to represent that debts incurred by reckless, or even negligent, acts are nondischargeable pursuant to § 523(a)(6).[12] *See Scharffe*, 817 F.2d

---

**10.** In *BancBoston Mort. Corp. v. Ledford* (*In re Ledford*), the Sixth Circuit acknowledged the question regarding the retroactivity of *Grogan* but did not decide the issue because the burden of proof was not an element of its analysis. 970 F.2d 1556, 1558 n. 1 (6th Cir.1992).

**11.** The legislative history incorrectly states the *Tinker* case was decided in 1902. In actuality, the case was decided on March 21, 1904.

**12.** Judge Spector referred to the tension between the "reckless disregard" standard and the appropriate § 523(a)(6) standard as a "slippery slope".

The problem with *Scharffe* is the signal it sends. On the surface it appears that the court essentially applied a "reckless disregard" standard in the face of legislative history evincing a desire to impose a stricter standard, thereby creating a "slippery slope" that Congress presumably sought to avoid. On the surface, the facts in *Scharffe* "sound like" negligence (even if "appalling" or "gross"), but the court nonetheless concluded that the resulting liability was non-dischargeable based on a standard that purports to be much stricter than one of negligence or recklessness. *Woolner,* 109 B.R. at 253.

at 393. In *Woolner*, after thoroughly discussing and analyzing the *Scharffe* facts, Judge Spector persuasively concluded *Scharffe* does not stand for the proposition that negligent or reckless acts are nondischargeable under § 523(a)(6).[13] *Woolner*, 109 B.R. at 254. Section 523(a)(6) is concerned with debts incurred which are tantamount to intentional torts. *Id.* at 252.

In arriving at this conclusion, Judge Spector utilized the RESTATEMENT (SECOND) OF TORTS to more specifically define "willfulness" under § 523(a)(6). Judge Spector focused on the tort law definition of "intent".

The term "intent" is used by the Restatement to "denote that the actor *desires to cause consequences of his act,* or that he *believes that the consequences are substantially certain to result from it.*" RESTATEMENT (SECOND) OF TORTS § 8(a). *Scharffe* did not require proof that the actor actually intended to cause the resulting injury. 817 F.2d at 394. Stated somewhat differently, and using the terminology of the Restatement, *Scharffe* held, in effect, that the *actor's belief that the harm is substantially certain to occur can be inferred from the nature of the act.*

*Id.* at 252 n. 1 (emphasis added). After closely analyzing the tort law definition, it is clear there are two types of intent. First, "actual" or "specific" intent where the actor "desires to cause [the] consequences of his act". RESTATEMENT (SECOND) OF TORTS § 8A (1965). Second, "inferred" intent where the actor "believes the consequences [of his acts] are substantially certain to result from it".[14] *Id.*

Bankruptcy decisions have recognized both types of intent under § 523(a)(6).[15] In *Scharffe*, the Sixth Circuit concluded that to establish "willfulness" under § 523(a)(6), the plaintiff must prove the debtor committed an intentional act which necessarily results in injury.[16] *Scharffe*, 817 F.2d at 394; *Vulcan Coals*, 946 F.2d at 1229. The Sixth Circuit has impliedly adopted the inferred intent standard as the minimum requirement necessary under the "willful" prong of § 523(a)(6). Therefore, a plaintiff, as a minimum requirement under § 523(a)(6), must establish "inferred intent". More specifically, this means if the court determines that by the nature of his or her act, the debtor knew, or should have known,

---

**13.** Judge Spector reviewed the file contents and lower court opinions regarding the *Scharffe* case. He stated that the trial record supported factual findings the debtor knew his acts would cause injury, proceeded anyway, and violated a duty to the plaintiff. 109 B.R. at 253–54. Judge Spector correctly concluded the debtor's actions in *Scharffe* were more than merely negligent or reckless conduct. *Id.* at 254.

**14.** Comment b to the Restatement illustrates the difference between specific intent and inferred intent.

All consequences which the actor desires to bring about are intended.... Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness.... As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence....

RESTATEMENT (SECOND) OF TORTS § 8A cmt. b (1965).

**15.** The different fact patterns involved in § 523(a)(6) decisions dictate whether the specific intent or inferred intent standard is utilized to determine "willfulness". The uncomplicated case occurs under the unlikely factual setting where a debtor explicitly admits to the specific intent to injure. The much more difficult cases occur when a court must infer intent.

**16.** Although the legislative history establishes "willful" conduct results from intentional acts, there is a split of authority regarding the *type* of intent necessary to satisfy § 523(a)(6). One line of authority requires the debtor to commit an act with specific intent to cause injury. *See, e.g., Barclays American/Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875 (8th Cir.1985); *Farmers Ins. Group v. Compos (In re Compos)*, 768 F.2d 1155 (10th Cir.1985). The other line of authority only requires a showing the debtor committed an intentional act which necessarily results in an injury. No specific intent to injure is necessary. *See, e.g., Impulsora Del Territorio Sur, S.A. v. Cecchini (In re Cecchini)*, 780 F.2d 1440 (9th Cir.1986); *Kelt v. Quezada (Matter of Quezada)*, 718 F.2d 121 (5th Cir.1983), *cert. denied,* 467 U.S. 1217, 104 S.Ct. 2662, 81 L.Ed.2d 368 (1984).

the resulting harm was substantially certain to occur, the "willful" prong of § 523(a)(6) is satisfied.[17] *Woolner*, 109 B.R. at 252 n. 1. In determining whether intent should be inferred, the debtor's belief should be reviewed by an objective, or "reasonable person", standard considering the totality of the circumstances.[18] *Mounts v. Greve (In re Greve)*, 97 B.R. 383, 387 (Bankr.S.D.Ohio 1989).

In the case at bar, the Debtor committed four separate acts: (1) operating an automobile without insurance; (2) operating an automobile with a suspended license; (3) driving at a minimum of fifty miles per hour in a thirty five mile per hour speed zone; and (4) accelerating through a red light at a congested intersection at 3:00 p.m. on a Friday. Because the Debtor denies having the intent to harm Sparks, to satisfy the "willful" prong of § 523(a)(6), inferred intent must exist. Considering the totality of circumstances, the Debtor acted "willfully" if he knew, or should have known, that the resulting harm to Sparks, or other unknown vehicle drivers, was substantially certain to occur by committing one or more of these acts.

Although driving without automobile insurance is a violation of state law,[19] bankruptcy courts have generally refused to hold that such an act is "willful" under § 523(a)(6). *See Basham v. Druen (In re Druen)*, 121 B.R. 509, 512 (Bankr.W.D.Ky. 1990); *Pritchard v. Eberhardt (In re Eberhardt)*, 92 B.R. 773, 777 (Bankr.E.D.Tenn. 1988). *But see Whipple*, 138 B.R. at 141

(driving negligently without insurance results in a "willful" economic injury). An automobile collision is not necessarily the result of a debtor's intentional act of driving without insurance. Paraphrasing the Restatement of Torts, a debtor does not have knowledge the act of driving without insurance is substantially certain to result in an automobile collision. Even though a reasonable person would not drive without insurance, such an *act* does not *result* in an automobile collision. Therefore, this court holds that the act of driving without Michigan no-fault insurance is not "willful" pursuant to § 523(a)(6).

This court is seriously troubled, and perhaps outraged, by the fact the Debtor operated his vehicle with the knowledge his license had been suspended. This court has been unable to locate any decision which directly discusses whether driving with a suspended license is "willful" under § 523(a)(6). The lack of insurance cases under § 523(a)(6) are somewhat analogous to driving with a suspended license. Similar to driving without automobile insurance, driving with a suspended license is a violation of state law. *See* MICH.COMP.LAWS ANN. §§ 257.317–257.323c. Nevertheless, like the lack of insurance cases, the act of driving with a suspended license does not necessarily *result* in an automobile collision. A debtor does not know, nor should he know, that by driving without a valid license an automobile collision is substan-

---

**17.** Paraphrasing the Restatement to this adversary proceeding, "[i]f the [Debtor] knows that the [automobile collision is] certain, or substantially certain, to result from his [driving without a license, or driving with a suspended license, or speeding, or running the stop signal], and still goes ahead, he is treated by the law as if he had in fact desired to produce [Sparks' injuries]." RESTATEMENT (SECOND) OF TORTS § 8A cmt. b (1965).

**18.** By utilizing an objective standard, a court is able to discount or discredit a debtor's certain testimony that he or she did not intend the result in question.

Since intent is a state of mind, it is plainly incorrect for a court to instruct a jury that an actor is presumed to intend the natural and probable consequences of the actor's conduct;

but it is correct to tell the jury that, relying on circumstantial evidence, they may infer that the actor's state of mind was the same as a reasonable person's would have been. Thus, when the driver who whips his horses with a loud yell while passing a neighbor's team denies intent to cause a runaway, the factfinder may discredit the driver's testimony; and the defendant on a bicycle who rides down a person in full view on a sidewalk where there is ample room to pass may learn that the factfinder (judge or jury) is unwilling to credit the statement, "I didn't mean to do it."

W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 8, at 36 (5th ed. 1984) (footnotes omitted).

**19.** *See* MICH.COMP.LAWS ANN. §§ 257.501–257.532.

tially certain to result.[20] Even though a reasonable person would not drive with a suspended license, such an act does not result in an automobile collision.

■ However, the Debtor's act of speeding and accelerating through the red signal light at a congested intersection is much different. Considering the totality of the circumstances, both the combined act of speeding and running the red light are "willful" pursuant to § 523(a)(6). Officer Knechtel testified that speeding through the stop signal at the intersection of South Logan Street and West Mount Hope on a Friday at 3:00 p.m. is like "playing russian roulette with five bullets in the chamber." In assessing the testimony and evidence, this court agrees that by accelerating while speeding through the stop light under this factual situation, the chance of injuring some person was extremely high. By deciding to speed through the red light, a reasonable person would know, or should have known, with substantial certainty that a high speed collision would occur. Even though the Debtor claims to not have intended the collision with Sparks, under these facts, the court can, and will, infer intent. The Debtor acted "willfully" when he made the decision to accelerate into the left lane and continue speeding through the stop signal. He should have known this act was substantially certain to result in serious injury to *some person*, regretfully Sparks. Therefore, this court holds that the Debtor acted "willfully" pursuant to § 523(a)(6).

B. *"Malicious" Injury Under § 523(a)(6).*

The second prong which must be established under § 523(a)(6) is "malicious" inju-

ry. "Malice" is a word with serious inferences yet its legal meaning and interpretation is labyrinthine.[21] "Malice" is generally defined as "[a] conscious violation of the law (or the prompting of the mind to commit it) which operates to the prejudice of another person. A condition of the mind showing a heart regardless of social duty and fatally bent on mischief." BLACK'S LAW DICTIONARY 956 (6th ed. 1990).

For purpose of nondischargeability, *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), offers a compelling and excellent discussion regarding the meaning of "malice". The *Tinker* decision is based upon § 523(a)(6)'s predecessor in the Bankruptcy Act of 1898. The *Tinker* Court analyzed whether a judgment was nondischargeable as a result of "wilful and malicious injuries to the person or property of another". *Id.* at 480, 24 S.Ct. at 506. In analyzing "malice", the Court stated:

"Malice, in common acceptation, means ill will against a person; but in its legal sense it means a wrongful act, done intentionally, without just cause or excuse. If I give a perfect stranger a blow likely to produce death, I do it of *malice,* because I do it *intentionally* and without just cause or excuse. If I maim cattle, without knowing whose they are, if I poison a fishery, without knowing the owner, I do it of *malice,* because it is a wrongful act, and done intentionally. If I am arraigned of felony, and wilfully stand mute, I am said to do it of *malice,* because it is intentional and without just cause or excuse. If I traduce a man, whether I know him or not and whether I intend to do him an injury or not, I apprehend the law considers it done of

20. An argument could be made that because the Debtor was not authorized to drive, he had absolutely no business being on the road. Therefore, because the Debtor intentionally operated his vehicle when he should have been walking, riding a bus, or taking a taxi, Sparks' injuries would have never occurred. Although this argument may be compelling if there was more evidence regarding the Debtor's normal driving habits (i.e., the Debtor always drives like a maniac), under these facts it is not persuasive. Taking into account the totality of the circumstances, by deciding to drive to and from work

on November 30, 1984, the Debtor could not have been substantially certain he would cause the automobile collision. Additionally, the fact that the Debtor decided to drive without a license was not the *cause* of the collision. Other persons may drive like "mad persons" even with a valid driver's license.

21. A tort law treatise states that "no word in the law is used more loosely than the word *malice*." 2 FOWLER V. HARPER ET AL, THE LAW OF TORTS § 5.27 (2d ed. 1986) (emphasis in original).

malice, because it is wrongful and intentional. It equally works an injury, whether I meant to produce an injury or not...."

*Id.* at 486, 24 S.Ct. at 508 (citation omitted) (emphasis in original).

Because of the legislative history of § 523(a)(6), the validity of the *Tinker* discussion regarding "malice" has been questioned. *See* Weinberg, *supra,* at 140–45. This court believes *Tinker*'s statements regarding the meaning of "malice" continue to be valid precedent for two reasons. First, the legislative history to § 523(a)(6) refers only to the "willful" prong and not to the "malicious" prong. The legislative history's reference to overruling those cases which interpret *Tinker* to apply a "reckless disregard" standard only involves the "willful" prong of § 523(a)(6).[22] Second, and very importantly to *this* court, the Sixth Circuit has specifically adopted the *Tinker* definition of "malicious" for § 523(a)(6) purposes. In *Wheeler,* the Sixth Circuit stated its definition of "malicious" as "conscious disregard of one's

duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." 783 F.2d at 615 (quoting *Tinker,* 193 U.S. at 486, 24 S.Ct. at 508). Therefore, this court concludes that the standard for "malice" as discussed in *Tinker v. Colwell* is still binding precedent.[23]

Even agreeing that the *Tinker* malice standards are viable precedent does not settle the issue of the proper definition of "malice" under § 523(a)(6). A multitude of standards have evolved from the *Tinker* definition of malice.[24] This plethora of definitions arises because, pursuant to § 523(a)(6), malice can be actual[25] or implied.[26] *Lee v. Ikner (In re Ikner),* 883 F.2d 986, 991 (11th Cir.1989); *Druen,* 121 B.R. at 511; Karen N. Fischer, Comment, *The Exception to Discharge for Willful and Malicious Injury: The Proper Standard for Malice,* 7 BANKR.DEV.J. 245, 246 (1990).

■ Because "malice" may be proven without establishing personal hatred, spite, or ill-will on behalf of the debtor, for a debt

---

**22.** As stated by one commentator:

Read in this light, the mysterious omission of "malicious" in the legislative history is meaningful. The legislative history, in effect, states (1) "willful" means "intentional or deliberate," (2) to the extent that *Tinker* addressed the question of "willfulness," ... it is overruled, (3) to the extent that other courts used *Tinker* to include "reckless disregard" within "willfulness," they are overruled, and (4) we do not mention "maliciousness," so the *Tinker* standard of "malicious" remains.

Weinberg, *supra,* at 144.

**23.** In *Credithrift of America v. Auvenshine (In re Auvenshine),* 9 B.R. 772 (Bankr.W.D.Mich. 1981), Judge Nims held because the language of § 17(a) of the Bankruptcy Act of 1898 and § 523(a)(6) are identical, the legislative history of § 523(a)(6) did not overrule *Tinker.*

Legislative history is a helpful tool in determining the intent of the legislature where that intent is not clear. But, I fail to see how a statement in a report prepared for the assistance of Congress, usually by unidentified person, can overrule decisions of the United States Supreme Court where almost the identical language is involved. In my opinion, *Tinker* ... is still operative and controlling.

*Id.* at 775. Because of the Sixth Circuit's subsequent rulings, this court believes the analysis utilized in *Auvenshine* is unnecessary. The Sixth Circuit has rejected the "reckless disregard" standard for "willful" and adopted the

*Tinker* standard for "malice". In this circuit, the issue of the vitality of *Tinker* has, in this judge's view, been decided. *See Vulcan Coals,* 946 F.2d at 1228–29; *Scharffe,* 817 F.2d at 393–94; *Wheeler,* 783 F.2d at 615.

**24.** One commentator sets forth four different standard for "malice" which have evolved from *Tinker.*

What then, is the *Tinker* standard of malice? One definition ... is "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill will. Other courts define the term as "knowing the act will harm another and proceeding in the face of that knowledge." Still other variations such as "knowing disregard of the rights of another," or "naturally expecting injurious consequences to result from a wrongful act," exist. Weinberg, *supra,* at 144–45 (footnotes omitted).

**25.** For general purposes, actual malice, also referred to as malice in fact, is defined as "[i]ll will towards a particular person; an actual intention to injure ... a person." BLACK'S LAW DICTIONARY 957 (6th ed. 1990).

**26.** For general purposes, implied malice, also referred to as malice in law, is "presumed from tortious acts, deliberately done without just cause, excuse or justification, which are reasonably calculated to injure another or others." BLACK'S LAW DICTIONARY 958 (6th ed. 1990).

to be nondischargeable pursuant to § 523(a)(6), a creditor must, as a minimum requirement, prove a debtor acted out of implied malice. *See Vulcan Coals,* 946 F.2d at 1229; *Scharffe,* 817 F.2d at 394; *Wheeler,* 783 F.2d at 615. *Tinker* also analyzed implied malice:

> " 'Malice,' in law, simply means a depraved inclination on the part of a person to disregard the rights of others, which intent is manifested by his injurious acts. While it may be true that in his unlawful act [the defendant] was not actuated by hatred or revenge or passion toward the plaintiff, nevertheless, if he acted wantonly against what any man of reasonable intelligence must have known to be contrary to his duty, and purposely prejudicial and injurious to another, the law will imply malice."

193 U.S. at 486–87, 24 S.Ct. at 509 (citation omitted). Therefore, in accordance with *Tinker* and *Wheeler,* this court concludes implied malice for § 523(a)(6) purposes is proven when a creditor shows a debtor acted in conscious disregard to the rights of others, without just cause or excuse. *Id.* at 486–87, 24 S.Ct. at 508–09; *Wheeler,* 783 F.2d at 615.

██ As stated previously, the Debtor committed four acts on November 30, 1984. Considering the totality of these acts, this court concludes that the Debtor acted "maliciously" within the meaning of § 523(a)(6). Although not "willful", the facts that the Debtor operated his vehicle without insurance and with a suspended license demonstrates his "hell-bent" attitude toward other drivers and pedestrians, whether known or unknown, on the date and time of the incident. These acts manifest a person with no regard for the law or the rights and safety of other individuals. Although there is no express indication of malice, by these facts alone, implied malice exists. Further, in addition to failing to maintain insurance and a valid license, the Debtor's

acts of speeding and accelerating through a red traffic signal at a congested intersection at a busy time of day also support a finding of implied malice. An individual who makes these types of voluntary unfeeling, "cold heart" decisions unquestionably demonstrates a conscious disregard for the rights of others. The Debtor has presented *no* sufficient just cause or excuse for his actions. Therefore, this court holds that the Debtor acted "maliciously" pursuant to § 523(a)(6).

## VI. CONCLUSION

In accordance with the discussion above, this court holds that the state court judgment entered against the Debtor was the result of a "willful and malicious injury" pursuant to § 523(a)(6). Therefore, the November 30, 1987 state civil court judgment entered on behalf of Sparks against the Debtor is nondischargeable in the amount of $150,000, together with any interest or costs awarded in that judgment.[27]

An order shall be entered accordingly.

---

**27.** The amount of a state court default judgment has limited collateral estoppel effect. Therefore, even though the dischargeability of a default judgment pursuant to § 523(a) does not have collateral estoppel effect regarding "willful" and "malicious" in this adversary proceed-

ing, this court is bound by the state court's determination of the amount of damages awarded to Sparks. *See Brown v. Sachs (Matter of Brown),* 56 B.R. 954, 959 (Bankr.E.D.Mich. 1986) (citing *In re Comer,* 723 F.2d 737, 739–40 (9th Cir.1984)).